UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 06-60646-CIV-COHN/SNOW

VITAL PHARMACEUTICALS, INC.,
a Florida corporation,

        Plaintiff,

v.

S.A.N. NUTRITION CORPORATION,
a Nevada corporation,

        Defendant.

_____/

## ORDER GRANTING PLAINTIFF'S MOTION TO DISMISS AND MOTION TO ENFORCE FULL AND FINAL SETTLEMENT

**THIS CAUSE** is before the Court upon Plaintiff Vital Pharmaceuticals, Inc.'s

Motion to Dismiss and Motion to Enforce Full and Final Settlement [DE 33].  The Court

has considered the Motion, Defendant's Response [DE 45], Plaintiff's Reply [DE 51],

the evidence presented at the evidentiary hearing held on May 31, 2007, the arguments

of counsel, and is otherwise fully advised in the premises.

### I.    BACKGROUND

The instant Motion to Dismiss and Motion to Enforce Full and Final Settlement

was filed by Plaintiff Vital Pharmaceuticals, Inc. ("VPX") following protracted settlement

negotiations.  In this Motion, Plaintiff alleges that its counsel did, in fact, reach a final

settlement on all material terms with counsel for Defendant S.A.N. Nutrition Corporation

("S.A.N."), but that S.A.N. stalled and eventually refused to sign the settlement

agreement following an Order from Judge Middlebrooks in a similar case granting

attorney's fees to the defendant in that case.  Plaintiff now seeks enforcement of the

agreement it claims was reached, as well as dismissal of the case, as agreed upon in that settlement.  Defendant argues in response that no agreement was ever reached between counsel for the two parties and, in any event, counsel for S.A.N. did not  have clear and unequivocal authority to settle the case on behalf of his client.

At the evidentiary hearing, three witnesses provided testimony: Joseph Chovanes, counsel for S.A.N.; Gregg Metzger, former counsel for VPX; and Matthias Boldt, president of S.A.N.  At the conclusion of the hearing, the Court took Plaintiff's Motion under advisement, and now makes the following findings of fact and conclusions of law.

## II.    FINDINGS OF FACT[1]

### *Credibility Determinations*:

1. The Court found Joseph Chovanes' testimony to be lacking in credibility.

2. Mr. Chovanes' testimony was evasive, combative and replete with prevarication.

3. To the contrary, the Court found Gregg Metzger's testimony to be credible and worthy of belief.

4. Mr. Metzger answered the questions that were posed to him in a straightforward and forthright manner, detailing the settlement negotiations between himself, as representative of VPX, and Mr. Chovanes.

5. Further, Mr. Metzger's email communications during the settlement negotiations reflect good faith negotiations, clearly and honestly communicating the extent of his authority from his client at all times, all of which added to his credibility as a

---

[1]    Any factual findings that may represent conclusions of law are adopted as conclusions of law.

witness.

6.   The Court found Matthias Boldt's testimony to be self-serving, programmed, and contrived.

7.   Mr. Boldt testified that he was kept entirely in the dark by his attorney on all aspects of the settlement negotiations except where the evidence explicitly showed otherwise, which the Court finds to be exceedingly unlikely, in light of the prior existing five year attorney-client relationship between Boldt and Chovanes and their frequent communications throughout the negotiation process.

8.   Boldt's testimony appeared to be heavily coached and entirely self-serving, and as such, it has been given minimal weight in the Court's consideration of this Motion.

**_Settlement Negotiations_**:

1.   Joseph Chovanes acted as counsel for Defendant S.A.N. in this matter and participated in settlement negotiations with VPX in that role.

2.   Chovanes has been one of the attorneys employed by S.A.N. for approximately five years, and has acted as counsel for S.A.N. in three to four lawsuits. (Matthias Boldt Testimony.)[2]

3.   Chovanes communicated frequently with Boldt regarding ongoing litigation, but did not provide Boldt with copies of email correspondence to and from opposing counsel. (_Id._)

---

[2] The Court did not receive a transcript of the hearing held on May 31, 2007. Therefore, the testimony of all witnesses will be referred to solely by their name without reference to a transcript page number.

3

4.     Gregg Metzger and other attorneys at the law firm of Feldman Gale acted as

counsel for VPX at the time of these negotiations and participated in settlement

negotiations with Chovanes in that role.  (Gregg Metzger Testimony.)

5.     Settlement negotiations between VPX and S.A.N. began on January 16, 2007,

following the entry of an Order of Final Disposition against VPX in a similar case

before Judge Middlebrooks. (Joseph Chovanes Testimony.)  Counsel from

Feldman Gale, the firm that was representing VPX at the time, called Mr.

Chovanes on that date to inquire about a possible settlement in light of the

decision in Judge Middlebrooks' case.  (Id.)

6.     In an email dated January 18, 2007, Chovanes responded, stating that he had

discussed possible settlement with his client, but that his client would only agree

with dismissal on a with prejudice basis and had requested that attorney's fees

be repaid.  (Exhibit 52.)

7.     Chovanes testified that he would not make the representation that his client had

specifically requested something unless he had authorization from the client to

do so.  (Chovanes Testimony.)

8.     In a phone conversation on January 19, 2007, Metzger and Chovanes discussed

settlement further.  Metzger mentioned the possibility that VPX would appeal the

Middlebrooks decision in the similar case, and expressed VPX's desire not to

have an adjudication on the merits in this case, suggesting a covenant not to sue

conditioned on the results of such an appeal.  Chovanes responded that he

could not recommend any conditional settlement to his client.  (Chovanes

Testimony.)

4

9.    In an email sent on January 22, 2007, Metzger advised Chovanes that he had
      spoken with his client, VPX, and was authorized to draft for Chovanes' review a
      covenant not to sue from VPX to S.A.N. that would not be contingent on the
      outcome of an appeal. (Exhibit 53.)

10.   This draft was sent via email on January 24, 2007 (Exhibit 54.)  Metzger advised
      Chovanes in this email that he still had not received final approval of this
      particular draft from VPX, but clarified that he was authorized to propose a non-
      contingent covenant not to sue as a general matter.  (Id.)

11.   Chovanes responded via email on January 25, 2007, proposing some changes
      to the draft covenant not to sue. (Exhibit 55.)  Chovanes testified that he did not
      have authority from his client to send this draft, nor did he at any point have
      authority to agree to any settlement or any terms of any proposed settlement.
      (Chovanes Testimony.)  However, he did not clearly express any such lack of
      authority at any time in his communications with Metzger (Metzger Testimony;
      Chovanes Testimony.)

12.   Metzger responded via email on January 29, 2007, enclosing another revised
      version of the covenant not to sue and explaining the changes made.  (Exhibit
      56.)

13.   Chovanes responded via email on January 30, 2007, enclosing a major revision
      of the settlement agreement. (Exhibit 57.)  Chovanes also stated, "I am
      authorized to settle the case for half [of S.A.N.'s current attorney's fees] from
      VPX – $26,000 to S.A.N. from VPX" (Id.)  Chovanes warned Metzger that if
      Judge Middlebrooks grants attorney's fees to the defendant in the similar case,

5

the likelihood of S.A.N. getting its fees in this action would be more certain, so it would cost VPX more to settle. (Id.) Chovanes testified that he was, in fact, authorized by Boldt to offer that amount to settle the case. (Chovanes Testimony.)

14. On February 7, 2007, Metzger suggested putting aside the other matters and attempting to resolve the amount of money to be paid in attorney's fees. (Chovanes Testimony.) Chovanes sent an email to Metzger on that date advising that his client has made a counteroffer of $20,000 for attorney's fees, and that this was his final offer. (Exhibit 58.)

15. Metzger responded via email on February 8, 2007, advising that he was consulting with his client, VPX, and would let Chovanes know what they decided. (Exhibit 35.)

16. Metzger sent a draft settlement agreement and stipulation for dismissal to Chovanes via email on February 15, 2007, including the $20,000 figure. (Exhibit 36.)[3]

17. Metzger then emailed again on February 16, 2007 to advise Chovanes that a

---

[3] Chovanes testified that he assumed Metzger did not have authorization from VPX to present this draft, stating that at this point, the lawyers were simply negotiating, and the clients hadn't entered into the negotiations yet. The Court finds this assertion to be absurd, defying common sense and reason, totally lacking in credibility and unsupported by the evidence. Both VPX and S.A.N. had already played an active role in these negotiations, with Chovanes expressing several clear requests and offers from his client, and Metzger clearly stating when his client had and had not approved a given draft. The evidence is clear that both counsel were in ongoing communication with their respective clients, and that the clients were very much involved in the negotiations at this stage. As articulated below, the Court finds that Chovanes had binding authority from Boldt to settle the case for $20,000 in attorney's fees and certain confidentiality language in paragraph 4 of the agreement.

partner of his had some suggestions to tighten up the language of the draft, and so Metzger would be sending another draft including those changes later that day. (Exhibit 37.)

18.  Chovanes responded the same day, stating "ok, fine," and conveying a request from his client that certain changes be made to the language of paragraph 4 regarding confidentiality. (Exhibit 38.)

19.  Metzger responded to Chovanes the same day, suggesting another proposed revision to paragraph 4. (Exhibit 39.)

20.  Chovanes replied the same day, stating "let's not complicate this too much by specifying language and possibly reopening in the case." (Exhibit 40.) He also proposed revised language for paragraph 4. (Id.)

21.  Metzger responded later that same day, advising Chovanes that he would consider Chovanes' most recent proposed language for paragraph 4 and let him know. (Exhibit 41.) Metzger also attached the revised draft of the settlement agreement, including his partner's changes, as promised earlier in the day, requesting that Chovanes let him know if the settlement agreement was acceptable aside from the pending issue regarding the language of paragraph 4. (Id.)

22.  Chovanes responded to Metzger the same day, stating "the changes look fine – let's finish this." (Exhibit 42.)[4]

23.  The next Monday, February 19, 2007, Metzger sent an email to Chovanes

---

[4] This email sent by Chovanes to Metzger on February 16, 2007, is the clearest indication of an agreement.

7

advising him he had sent the settlement agreement to VPX for execution and would let him know if any issues came up. (Exhibit 43.)

24.     Chovanes responded to this email, requesting that Metzger send him a copy as well, because he did not have "the final with the new paras." (Exhibit 44.)

25.     Metzger responded to Chovanes the next day, February 20, 2007, attaching the version of the settlement agreement he had submitted to VPX, and advising Chovanes that VPX intended to execute the document. (Exhibit 45.) This version of the settlement agreement was comprised of the most recent version, sent to Chovanes on February 16, 2007, and to which Chovanes responded "the changes look fine," but with the most recent revisions to paragraph 4 as suggested by Chovanes. (Chovanes Testimony.)

26.     On February 21, 2007, Metzger sent Chovanes another email, attaching the settlement agreement executed by VPX and asking that Chovanes have S.A.N. counter-execute the agreement and provide Metzger with a copy. (Exhibit 46.)

27.     On February 23, 2007, Judge Middlebrooks issued an order in the similar case, granting attorney's fees for that defendant. (Chovanes Testimony.)

28.     On February 27, 2007, Stephanie Alvarez, counsel for VPX, sent an email to Chovanes, following up on a voice mail message of the day before, inquiring as to when VPX could expect to receive a copy of the fully-executed agreement. (Exhibit 47.)  Chovanes responded via email, advising that he was trying to reach the client and would let her know as soon as he could. (Exhibit 48.)

29.     On March 7, 2007, Alvarez sent another email to Chovanes, inquiring as to when VPX would be receiving the executed settlement agreement and advising that if

the agreement was not received by the next day, VPX would move to enforce the settlement. (Exhibit 49.) Chovanes responded the same day, stating simply "there is no settlement to enforce." (Exhibit 50.)

30.    Metzger and Alvarez both spoke with Chovanes on the phone that day, after receiving this email. In his conversation with Metzger, Chovanes referred to the Middlebrooks order granting attorney's fees and expressed that S.A.N. was now seeking more compensation for attorney's fees and no provision for confidentiality in the settlement agreement.[5] (Chovanes Testimony; Metzger Testimony.) Chovanes indicated during this conversation that he was speaking on his client's behalf. (Metzger Testimony.)

## III.    CONCLUSIONS OF LAW

The Court has jurisdiction to enforce a settlement agreement where, as here, one party refuses to abide by the agreement and the action has not yet been dismissed. Kent v. Baker, 815 F.2d 1395, 1399-1400 (11th Cir. 1987). In determining whether an enforceable settlement agreement exists, the Court must determine two legal questions: first, whether Chovanes had "clear and unequivocal authority" to enter into a binding settlement agreement on behalf of his client, S.A.N., and second, whether a binding agreement was reached between Chovanes and Metzger, counsel

---

[5] Chovanes initially testified that he did not recall mentioning that S.A.N. sought more attorney's fees and no confidentiality during that conversation with Metzger, but later in his testimony stated that he "may have" brought up these demands and "may have" referred to the Middlebrooks order. Metzger's recollection of this conversation, on the other hand, was quite clear, and included both of these statements from Chovanes. Based on an evaluation of this testimony, the Court finds that Metzger's account is the more truthful one, and that these demands were made by Chovanes on behalf of his client.

9

for VPX, under principles of contract law.

## A.   Whether Chovanes had clear and unequivocal authority

The Court concludes that Chovanes did have clear and unequivocal authority to enter into a settlement agreement on behalf of his client, S.A.N., at the time he was negotiating with counsel for VPX.  State law governs the construction of a settlement agreement and the attorney's authority to enter into a settlement agreement on behalf of his client. Ford v. Citizens & Southern National Bank, 928 F.2d 1118, 1120 (11th Cir. 1991). Under Florida law, the party seeking to enforce the settlement agreement must demonstrate that the other party's counsel had "clear and unequivocal authority to enter into the settlement agreement." Murchison v. Grand Cypress Hotel Corp., 13 F.3d 1483, 1485 (11th Cir. 1994). In Murchison, as in the instant case, the client knew that his attorney was conducting settlement negotiations and took an active role in directing his attorney during those negotiations, but claimed later that his attorney lacked authority to settle the case.  The court in Murchison concluded that the movant had met his burden of showing clear and unequivocal authority. Id. In so concluding, the court emphasized that Murchison was aware of and an active participant in the settlement negotiations, and that the trial court did not err in interpreting Murchison's silence when the settlement was announced in court as approval of that settlement. Id.

Although the instant case presents no facts directly analogous to Murchison's silent acquiescence in court, this Court concludes from other circumstances that Chovanes, like the attorney in Murchison, did have authority to settle the case on behalf of his client. According to his own testimony, Boldt was aware that S.A.N.'s attorney, Chovanes, was conducting settlement negotiations, and both Boldt and Chovanes

10

admit that Chovanes had the authority to participate in those negotiations. They simply maintain that Chovanes lacked the authority to enter into a binding settlement agreement. However, this is a distinction without difference, because the authority to negotiate terms of a settlement agreement necessarily includes authority to enter into a binding agreement. It is simply nonsensical to argue that Chovanes had the authority to make certain offers to VPX on behalf of his client, but not to enter into a binding agreement, when the making of an offer has the legal consequence of binding the offeror if that offer is accepted. Additionally, given Boldt's extensive involvement in dictating the terms for which Chovanes negotiated, the Court is convinced that Boldt authorized Chovanes to negotiate and make offers regarding all the essential terms of the agreement. The evidence presented at the hearing indicates that Boldt, at a minimum, specifically authorized Chovanes to negotiate the following essential terms: 1) dismissal with prejudice, 2) the "final offer" of $20,000 in attorney's fees, and 3) specific language in paragraph 4 regarding confidentiality.[6] The only reasonable and logical inference, based on Boldt's admitted authorization to Chovanes to make offers of settlement and Boldt's consistent communication with Chovanes throughout the course of the negotiations, is that Chovanes' role was to resolve the case.[7] Chovanes

---

[6] In his testimony, Boldt stressed that money was not the only, or even primary, sticking point in the settlement negotiations. However, in stating what *was* the primary sticking point, he pointed only to the issues regarding confidentiality. As the evidence shows, Boldt specifically authorized the offers regarding both money and confidentiality that were ultimately accepted by VPX.

[7] The Court emphasizes that the resolution Chovanes was able to negotiate is one that is both unusual and beneficial to his client: payment of a sizeable sum in attorney's fees for the Defendant by the Plaintiff and a dismissal of the action with prejudice.

11

in fact succeeded in resolving the case, but prior to the formality of executing a written memorialization, Chovanes and Boldt learned of the Middlebrooks order on attorney's fees and reneged on their agreement. Accordingly, the Court concludes that VPX has met its burden of showing that Chovanes had "clear and unequivocal authority" to enter into a binding settlement agreement on behalf of S.A.N.

## B. Whether a binding agreement was reached

The Court concludes that a binding agreement was reached by Chovanes and Metzger, as representatives of their respective clients, on all essential terms of the settlement. Basic contract law applies to determine whether a settlement agreement is enforceable, and in Florida, the objective test is used to determine whether such a contract is enforceable. Robbie v. Miami, 469 So. 2d 1384, 1385 (1985); Gaines v. Nortrust Realty Management, Inc., 422 So.2d 1037 (Fla. 3d DCA 1982). The party seeking enforcement of a settlement agreement has the burden of establishing assent by the opposing party. Williams v. Ingram, 605 So.2d 890, 893 (Fla. 1st DCA 1992). For a settlement agreement to be enforced, the agreement must be "sufficiently specific and mutually agreeable on every essential agreement." Don L. Tullis & Assocs. v. Benge, 473 So.2d 1384, 1386 (Fla 1st DCA 1985). Execution of the settlement agreement is not a condition precedent to a settlement agreement, but rather is merely a procedural formality. See Boyko v. Ilardi, 613 So.2d 103, 104 (Fla. 3d DCA 1996). Rather, courts look to traditional notions of offer and acceptance, and basic contract law, to determine whether an enforceable contract exists. See Robbie, 469 So.2d at 1385. "Settlement agreements are highly favored, and will be enforced whenever possible." Id.

The meeting of the minds in this case, as demonstrated in the evidence, is quite clear. On February 16, 2007, Metzger sent a draft settlement agreement to Chovanes, requesting that he consider it, aside from the pending issues regarding the language of paragraph 4. Chovanes responded "the changes look fine – let's finish this." Thus, Chovanes indicated his assent to the settlement agreement, aside from the open issue of paragraph 4. The most recent version of paragraph 4 on the table had been Chovanes', and was being considered by VPX. VPX then decided to accept Chovanes' offer to settle the case for the terms articulated in the settlement agreement and the language of his proposed version of paragraph 4, and subsequently communicated its acceptance via counsel and executed the settlement agreement. S.A.N.'s counter-execution of the agreement was a mere formality, but S.A.N. refused to do so, stating that there was no settlement agreement, and thus repudiating the binding contract it had already entered into by making an offer that was accepted by VPX.

S.A.N. has also argued that the language of paragraph 8, as Chovanes understood it, specified that the settlement agreement had to be executed by both parties to be binding and effective. First, and foremost, that is simply not what paragraph 8 says. Paragraph 8 provides "this Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and will become effective and binding upon the parties at such time as all the signatories hereto have signed a counterpart of this Agreement." (Exhibit 46.) This provision does not state that the settlement agreement will *only* become binding upon the execution of both parties. Rather, it simply provides for the execution of the agreement in counterparts, allowing the parties to each easily obtain a document that will be considered an

13

"original." To underscore this point, the Court notes that this provision states "each of which . . . will become effective and binding," [emphasis added]. There is not more than one settlement agreement at issue in this case; this provision, rather, quite clearly refers to the multiple copies of the written agreement, not to the settlement agreement reached in the case as a whole. Furthermore, Chovanes argues that because he understood this provision to mean that the settlement was not binding until signed by both parties, there was no meeting of the minds, and thus, no contract. This argument can be dismissed for two reasons. First, Mr. Chovanes' subjective interpretation of the terms of the contract, not expressed to anyone else until the day of the hearing, does not satisfy the objective test used in Florida to determine whether or not a contract exists. Second, paragraph 8 has not been asserted to be an "essential term" of this contract by any party, and agreement on the essential terms is all that is required to form a binding agreement. Thus, paragraph 8 of the settlement agreement does not provide that the agreement must be fully executed to be enforceable, and this Court will not interpret it as such.

Defendant S.A.N. also analogizes this case to Long Term Management v. University Nursing Care Center, arguing that the evidence in the record clearly establishes that the parties understood the agreement to be final and enforceable only upon the completion and execution of a written agreement. 704 So.2d 669 (Fla. 1st DCA 1997). In Long Term, the court held that the parties' comments on the record, including "it's a settlement subject to writing it down" and "that will be upon its full execution," indicated the parties' intent that the settlement not be binding until written down and executed. Id. at 674. The instant case is distinguishable, however, because

14

no objective evidence in the record provides any indication whatsoever that the parties did not intend to be bound until the agreement was written down and fully executed. In fact, the agreement was written down in its entirety, and given the multiple representations that Chovanes made to Metzger regarding his authority from his client to propose the terms that he proposed, the Court concludes that the parties, unlike those in Long Term, did intend to be bound by the terms that they negotiated and memorialized in a written settlement agreement, regardless of whether the formality of execution was carried out.

For the foregoing reasons, the Court concludes that a binding agreement was reached between Chovanes and Metzger, on behalf of their respective clients, to settle this case on the terms articulated in the settlement agreement that was accepted and executed by VPX.

## IV.   CONCLUSION

In simple terms, the parties to this case, through their counsel, reached an agreement on all essential terms, and indeed the form of the written agreement, until S.A.N. learned of Judge Middlebrooks' order in a similar case granting attorney's fees and decided a more lucrative settlement could be negotiated with that added bargaining power. In repudiating the agreement that had already been reached, declaring for the first time that Chovanes had no authority to settle the case, and demanding more money in attorney's fees and no confidentiality in light of the Middlebrooks order, S.A.N. acted in bad faith and breached a valid contract. Chovanes' argument that he had the authority to negotiate, but not to settle, is simply an inaccurate statement of basic contract law–if Chovanes did, as both he and Boldt testified, have the authority to make

15

offers on behalf of S.A.N., then he necessarily also had the power to bind S.A.N., and

the settlement agreement that he entered into with VPX will be enforced by this Court.

Accordingly, it is hereby

      **ORDERED AND ADJUDGED** as follows:

1.      Plaintiff Vital Pharmaceuticals, Inc.'s Motion to Dismiss and Motion to Enforce Full and Final Settlement [DE 33] is **GRANTED**.

2.      The Settlement Agreement executed by VPX and entered in the record at Exhibit 46 is the operative settlement agreement in effect between the two parties and constitutes a binding contract to which both parties must adhere.  Pursuant to that agreement, VPX is directed to deliver the sum of $20,000 to S.A.N. within five (5) days of receipt of this Order.

3.      Pursuant to the valid settlement reached in this case, the above-referenced action is **DISMISSED with prejudice**.

4.      All pending motions are **DENIED as moot**.  The Clerk of Court is directed to **CLOSE** this case for administrative purposes.

5.      Plaintiff VPX shall submit any Motion for attorney's fees incurred in enforcement of this settlement agreement, pursuant to paragraph 6 of the agreement, within twenty (20) days of receipt of this Order.

      **DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County,

Florida, on this _5th_ day of June, 2007.

 

**JAMES I. COHN**
**United States District Judge**

16

Copies provided to:

Counsel of record